UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| v. | ) | Criminal No. 17-10007-MLW |
| DAMIEN GALLOWAY | ) | LEAVE TO FILE GRANTED 11-25-17 |

## GOVERNMENT'S SENTENCING MEMORANDUM

This is a distressing case. On June 25, 2011, Judge Nancy Gertner sentenced the defendant to 48 months in prison (to be followed by 3 years of supervised release) on his conviction for possessing cocaine with intent to distribute in Case No. 10-CR-10351. A copy of the Judgment of Conviction for that case is attached as Exhibit 1.

Judge Gertner's sentence was 103 months below the low end of the career offender guideline range that then applied.[1] Her decision to vary eight-and-a-half years was based on her policy disagreement with the career offender guideline (i.e., that it overstated the seriousness of defendants' criminal history generally and also did so here), that the government's recommendation (120 months or 20% below the applicable GSR) would

---

[1] Had that sentencing occurred today, the defendant would not be a career offender because his prior convictions for resisting arrest are no longer career offender predicates.

create unwarranted disparities, and that a sentence of 48 months made sense in view of the defendant's prior state court sentences and because it would remove him from the Boston area for a substantial period of time.  See July 25, 2011 Sentencing Tr. (attached as Exhibit 2) at 32-35.

In reaching this result, Judge Gertner also issued the following caution to Mr. Galloway as to the impact of any future offending:

> A personal note. Mr. Mirashem must have told you –I don't know how to say this -- that in some sense you're lucky you appeared before me, that you would have gotten, could well have gotten different treatment in a different court, I don't know, but as I said a moment ago if you get in trouble again, no one's going to be able to help you and if anything stops you, it has to be that because when I went over my list of people, I've seen too many people throw their lives away, start at 22 and wind up in and out of jail for the next ten years and then end up either in the line of fire or dead or shooting someone.
>
> If you want this family to be proud of you, if you want to respect the memory of your father even, this is it. When you get out of jail in this case, there won't be another.

Statement of Reasons for Judgment of Conviction at 6-7; Sentencing Tr. at 35-36.[2]

Damien Galloway was released from Federal prison on January 17,

---

[2] During Mr. Galloway's allocution at the 2011 sentencing, he asked Judge Gertner to hear the "sincerity" in his voice that he wanted to become "a productive member of society."  Sent. Tr. at 31.  Judge Gertner responded by telling him, "You understand whatever I do here today, you get in trouble again, you've got a long life ahead of you, either federal or state, come in as a felon, as a multiple felon and you come in after you've done federal time, so you've got a huge amount if you get in trouble again. That should be enough." Id. at 31-32.

2014. During the period he was on Supervised Release, it appeared that the faith that Judge Gertner placed in him was justified. Apart from some relatively minor issues on which little action was taken,[3] the defendant did not violate his supervised release conditions, including the requirements to stay away from his compatriots at the H-Bloc gang or the areas of Roxbury that they frequent. See Associational and Geographic Restrictions appended to 2011 Judgment of Conviction, Exhibit 1 at 12 and 13.[4]

In additional to being nearly violation free, the defendant also made other positive strides that were impressive by any standard. The defendant graduated from the Operation Exit Building Trades Pre-Apprenticeship Program (a program run out of the Mayor's Office that gives offenders the opportunity to become apprentices with local construction trades) and

---

[3] On February 11, 2015, Probation notified the Court that the defendant had been arrested for operating after suspension. Probation also notified the Court that Mr. Galloway had successfully completed Operation Exit, had been accepted into the Carpenter's Union Apprenticeship Program, and that his license to operate had been reinstated. See Case No 10-cr-10351, Docket Entry 127. It did not request that the Court take any further action. See also PSR at ¶47 (noting that defendant had several instances of non-compliance while on Supervised Release that included operating after suspension, having contact with a known felon, and using marijuana; the latter violation resulted in one day in custody and his losing 4 weeks of credit in the RESTART program).

[4] At the 2011 Sentencing, the defendant's mother urged the Court to keep him out of his former neighborhood and away from his former associates. See Sentencing Transcript at 29 (in responding to a question from Judge Gertner asking whether Galloway's mother agreed that the defendant should get out of the neighborhood, the defendant's mother said: "Definitely. Even out-of-state, if possible. I would love that. I mean, I totally agree with everything. I think what you guys are saying are right, if he would --just straight restrictions and just anything to keep him off the street.")

became an Apprentice with the New England Carpenters Union, earning $31 per hour and working on a fairly consistent basis between 2014 and the time of his arrest. PSR at ¶ 80.  Even during times where there was no work, the defendant qualified for unemployment benefits and earned between $250 and $391 per week.  Id.  While on Supervised Release, the defendant was also accepted into and graduated from the Court's Restart Program, thereby earning a one-year reduction in his Supervised Release that, based on the certificate issued by Judge Sorokin attached as Exhibit 3, terminated the defendant's supervised release as of January 16, 2016.  PSR at ¶48.

All this progress came crashing down nine months later (on September 16, 2016) when the defendant was arrested on gun and drug charges by the Boston Police Department.  As more fully described in the PSR, that arrest took place after members of BPD's District C-11 Drug Control Unit saw the defendant engage in what they believed to be two drug deals inside a Honda parked in the lot of a small shopping center in Mattapan.  PSR at ¶¶ 9-23. When the officers approached the Honda to investigate, Galloway burst out of the passenger door and pushed one of the officers away in an effort to flee. Id. at ¶ 17. As he came out of the car, cash and a bag containing blue objects (later determined to be oxycodone pills) fell to the ground.  Id. at ¶ 11. After a resulting struggle, the officers first felt and then recovered a firearm

that Galloway was carrying in his right front pants pocket. Id. at ¶19. That gun turned out to be a Ruger Model .380 semi-automatic (reported stolen out of Florida in 2015) loaded with six rounds of .380 ammunition. Id. at ¶ 20. The police also recovered the $440 in cash and the plastic bag (that contained 50 oxycodone pills) that fell to the ground as Galloway attempted to run and later determined that Galloway was in possession of an additional $565 in cash and an Apple i Phone. Id. at ¶ 18. More oxycodone and a digital scale were recovered from the center console of the Honda, whose driver, Unique Long, was in possession of $345 herself. Fifteen more oxycodone tablets were recovered from Tyler Jones, one of the two men that the officers saw Galloway meeting with shortly before they approached. Id.at ¶ 23. The second male with whom Galloway met (Beshmir Subashi) had four strips of the drug suboxone that he said "they" gave me. The driver of the Pacifica also told police that he had driven his friend Beshmir to buy drugs.

## THE GUIDELINE COMPUTATIONS

Probation's Preliminary PSR was released on July 5, 2017. The PSR concluded that the defendant has a Total Offense Level of 23, a criminal History Category of IV, and an advisory guideline range of 70-87 months.

PSR at ¶¶ 28-38, 92.[5] Based on these calculations, the government is asking that the defendant be incarcerated for 72 months and that he be placed on Supervised Release for 3 years with the standard and special conditions discussed more fully below.

## THE DEFENDANT SHOULD BE SENTENCED TO 72 MONTHS IN PRISON

Of course, the calculation of the advisory guideline range does not dictate the appropriate sentence.  Based on the seriousness of gun crimes in this district, the manner in which the defendant committed the offense of conviction here, the persistence of the defendant's crimes since joining the criminal justice system at age 15, and the timing of the offense before the Court, the government seeks a sentence of 72 months to be followed by three years of Supervised Release.

### 1.   The seriousness of the Gun Offenses in this District

The first thing that supports the requested sentence of 72 months in this

---

5 Based on his 2011 federal drug trafficking conviction, the defendant had a Base Offense Level of 20.  PSR at ¶ 28.  He was also subject to two enhancements: two levels because his gun had previously been reported stolen; and four levels because he possessed the gun in connection with another felony offense (the possession of oxycodone with intent to distribute and the distribution of oxycodone). Id. at ¶¶ 29-30. The defendant's Criminal History Category remained at IV largely because two of his adult convictions (one for resisting arrest and another for gun possession and resisting arrest) were committed at age 17 and are now too old to be scored.  See USSG §4A1.2(d)(adult offenses committed prior to age 18 count for only 5 years unless the sentence exceeds 13 months).

6

case is the seriousness of the defendant's gun offense both as a general matter and in view of the particular way in which he carried it out.   The critical importance of sentencing gun cases coming from Boston's beleaguered neighborhoods with appropriate firmness stems from the need to punish the defendant and to deter him and those around him.

Gun offenses remain very serious crimes when committed in Boston neighborhoods like Roxbury, Dorchester, and Mattapan. See Braga et al. "The Concentration and Stability of Gun Violence at Micro Places in Boston, 1980–2008" 26 Journal of Journal of Quantitative Criminology at 33 (2010) (authors conclude that gun violence in Boston is intensely concentrated in small areas of the city; over 28 year period, 4.8% of city experienced 73.9% of street shootings and over 89% of city experienced none). Despite general reductions in crime rates in recent years, the simple fact is that, halfway through 2017, there has been an alarming increase in gun offenses citywide. See Boston Crime Statistics through July 16, 2017 (showing shootings are up nearly 30% over corresponding period in 2016) available at https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/596e07e82e69cf240a155b3c/1500383208286/Weekly+Crime+Overview+7-16-17+4.pdf.

Moreover, the tragedy associated with gun crime is not limited to the

victims and their families.   The insidious nature of the indirect damage caused by inner-city gun violence was noted in a Boston Globe op-ed piece published on April 20, 2014:

> A shooting doesn't just kill or injure its intended target. It wreaks havoc on families and friends, of course, and begins to spread fear as others wonder what's next. And when the shootings keep on coming, they're like a cancer eating away at a neighborhood. Terrorism is a sudden attack on a people. The scourge of violence in Mattapan, Roxbury, and parts of Dorchester is a slow-motion kind of terrorism, if you will. Because it happens gradually, one victim after another, it's less visible, less shocking. That makes it easy to become inured, seeing these crimes as just a regrettable fact of life. We need to resist that temptation. Evil that would destroy a community deserves equal outrage, whether perpetrated on Boylston Street or Humboldt Avenue.

Keane, Tom, "Gun Violence's Toll a Relentless Form of Terror" Boston Globe (April 20, 2014) (attached as Exhibit 4).

In requesting the Court to sentence Damien Galloway to 72 months in prison, the government does not seek to place the blame for urban violence solely on his shoulders.   No one was shot here because the arresting officers were able to secure Galloway and remove the gun before anything further could happen.   And of course, the defendant is only one of the many individuals arrested with firearms in Roxbury, Dorchester, or Mattapan.

But that is not the point.   Because violence reduction requires disarming men like Damien Galloway *before* they are able to use them and convincing others in these same neighborhoods to put their weapons away.

8

See generally United States v. Dillard, 214 F.3d 88, 93 (2nd Cir. 2000) ("The prohibition of gun possession by previously convicted criminals seeks to protect society by reducing the risk of violence that may result from the possession of guns by persons inclined to crime. By possessing guns in violation of that law, previously convicted criminals increase the risk that they may engage in violent acts. The risk results from the nature of the offense."). In view of the profound manner in which gun crime affects the quality of life in these neighborhoods, the message that needs to be heard is that gun crime cannot be tolerated, regardless of how old the offender is or where the gun is found. Not simply because some recent shooting has once again generated headlines, but because persistent gun crime by young men in small portions of our city reflects a culture of violence that the entire community needs to eradicate. Thus, imposing appropriate gun sentences (particularly when they are carried during drug trafficking by individuals with prior gun convictions),[6] is critically important to public safety in our

---

[6] The established correlation between drug trafficking and violence demonstrates why people possessing firearms during drug trafficking offenses are properly subject to four-level guideline enhancements under USSG §2K2.1(b)(6)(B). E.g., Kennedy, "Pulling Levers: Chronic Offenders, High-Crime Settings, and a Theory of Prevention," 31 Val. U. L. Rev. 449, 455 (1997) ("Street drug markets are notorious sources of violence, disorder, prostitution and other problems. Mark Klieman notes that hard core cocaine and heroin users, while numbering no more than three million nationally, commit crimes at very high rates; that three-quarters of them are likely to be arrested in any given year; and that they are likely to be on bail, probation, or parole when not actually incarcerated").

city.  See United States v. Politico**,** 522 F.3d 69, 72 (1st Cir. 2008) (in affirming above-guideline sentence in firearm trafficking case, First Circuit noted sentencing judge's reference to the "epidemic of handgun violence in communities within this district" and concluded that the district court "has the authority to conclude that the impact of this particular offense is more serious than that reflected by the Sentencing Commission."); United States v. Diaz-Arroyo, 797 F.32d 725, 729 (1st Cir. 2015)(affirming sentence in gun case substantially above advisory guideline range based on sentencing judge's observations regarding, inter alia, the high rate of violent crime in Puerto Rico and the plethora of young men on that island carrying dangerous weapons).

### 2. This is Galloway's Third Firearm Offense

Another factor that aggravates the seriousness of the offense of conviction here is that it is Galloway's *third gun offense*. See PSR at ¶¶ 42 and 43. "Rationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again--greater sanctions than might be required for a defendant who has never been convicted of a similar offense." United States v. Schmude, 901 F.2d 555, 559 (7th Cir. 1990).

In 2006, Galloway was incarcerated for one year after police recovered

a loaded Smith & Wesson from him in the area of Harvard Street in Dorchester.  As in this case, the officers recovered the gun only after Galloway both fled and resisted arrest.  This offense is described at paragraph 43 of the PSR.

Less than a year after he completed probation on his first firearm offense, he picked his second.  This one occurred when officers heard shots fired in the Orchard Gardens Housing Development in Dudley Square.  On arrival, the officers saw several individuals running towards them and saw an unidentified male get into a car that sped off in the opposite direction.  After a high-speed chase that resulted an accident involving the cruiser, Galloway (the driver of the other car) and two other men fled the scene.  But when they were apprehended, officers found a loaded firearm on the front seat of the car and Galloway was convicted of discharging a firearm within 500 feet of a building. PSR at ¶ 44.  The defendant violated probation in that case three times before he was ultimately incarcerated for another year.  The fact that the defendant has been convicted of gun offenses twice only to pick up another one here plainly shows that a guideline sentence is warranted. See also United States v. Devine, 2008 WL 312467, (D.N.C. 2008)(in sentencing gang member for gun offense, court found "that Devine (and others like him) will not be deterred absent a lengthy sentence. Both specific and general deterrence are

critical in this case, particularly given defendant's gang involvement, offense behavior, lengthy criminal record, and extremely high likelihood of recidivism. This court has seen numerous defendants who violated 18 U.S.C. §§ 922(g)(1) and 924, and finds this case uniquely troubling. The court shall impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct (both as to Devine personally and others like him), and protects the public from further crimes of the defendant").[7]

### 3. Galloway's Resistance While Armed

In determining the appropriate sentence in this case, it is not enough to look at the general concerns associated with gun offenses in Boston's beleaguered neighborhoods. This Court also needs to consider the particular facts of Galloway's offense and the way he resisted when Officers Belliveau and Lopez attempted to secure him. The danger he created to himself, the officers, and everyone else in a public parking lot by resisting with a loaded gun in his pocket is another important factor that aggravates the offense of conviction. Had Galloway's gun accidentally gone off or had he made a move

---

[7] Although not technically a gun offense, the defendant was also convicted in 2009 of being an accessory after the fact to a crime of Assault with a Dangerous Weapon (Gun). See PSR at ¶45.

that suggested to the officers that the gun was coming in their direction, this matter could have easily resulted in one or both of the participants (or anyone else unlucky enough to be in the area) being shot.  This, of course, would have left the police, the criminal justice system, and the community to pick up the pieces of what could have been a tragic and divisive incident.[8]

In short, Galloway's resistance while armed could have easily led to tragedy in any one of a number of ways.  If the mere possession of a gun is a serious crime, then resisting arrest while carrying a loaded weapon simply has to make the crime and the appropriate sentence more serious both to punish and to deter both the defendant and others from engaging in this type of dangerous behavior. See United States v. Hampton, 2004 WL 1249787 (10th Cir. 2004) (affirming enhancement on defendant who resisted arrest while carrying loaded firearm based on, among other things, fact that gun could have fired during struggle); United States v. Machett, 802 F.3d 1185, 1197 (8th Cir. 2015) ("Matchett 'recklessly created a substantial risk of death or serious bodily injury to another person,' U.S.S.G. §3C1.2, when he resisted arrest with a loaded handgun in his pocket"). Compare United States

---

[8] The government is not asking the Court to enhance the defendant's offense level for reckless endangerment but rather to merely consider Galloway's resistance in assessing where within the advisory guideline range the defendant should be placed.

v. Bell, 953 F.2d 6, 10 (1st Cir. 1992)(court rejected reckless engdangerment enhancement where evidence showed that defendant merely hesitated when approached by police while carrying loaded firearm; court noted that: "although Bell's conduct came close to the line, something more, reaching for the gun, for example, would be required for a finding that Bell recklessly created a "risk of death or serious bodily injury;" there was no evidence that the defendant affirmatively resisted arrest).[9]

### 4. Galloway's Criminal Record

Of course, the sentence in this case must also reflect Galloway's criminal history. Probation places him in CHC IV, even though neither of his prior gun convictions were scored and he has spent more than half of the last 10 years in custody. See PSR at ¶¶42 (conviction for resisting arrest committed at age 17 too old to be scored here); 43 (same for gun and resisting arrest convictions). See also PSR at ¶¶ 44 (defendant sentenced to year in prison in 2009 after probation violation); 45 (defendant sentenced to 18 months in prison in 2007 for being accessory after the fact to gun assault);

---

9 As one court has recognized in a directly analogous situation, "[a] struggle in which all the parties are armed carries an obvious risk that the struggle might escalate to the point that a firearm is used, or discharges accidentally." United States v. Williams, 278 Fed. Appx. 279, *1 (4th Cir. 2008) (upholding sentencing court's enhancement under USSG §3C1.2 based on defendant's brief struggle with police while he was armed).

47 (Defendant sentenced to 48 months in prison in 2011 for drug trafficking case). The fact that four of his adult convictions have not been scored because they were committed at age 17 suggests that CHC IV may understate the seriousness of the defendant's criminal history.  See PSR at ¶¶41, 42, 43, and 44; USSG § 4A1.3 (prior sentences not used in computing criminal history category may justify upward departure).   Other aspects of Galloway's criminal history stand out as well.   Such as the fact that he has been under nearly continuous criminal justice supervision since the age of 15 during which time he been determined to be delinquent in one case, been convicted of 17 adult offenses in seven more cases and has been sent to jail six times.  PSR at ¶¶ 41-47.  Or that he has violated probation five times (despite the absence of any serious violations in federal court) and has repeatedly committed new crimes while already under criminal justice supervision. Id. at ¶¶ 40 (probation violation); 41 (four probation violations in 2008-09); 42 (commission of gun offense while on pretrial release for earlier drug offense); 43 (commission of new offense while on pretrial release); 43 (same).   The defendant's disinterest in his criminal justice obligations also justifies the requested guideline sentence. See United States v. Hernandez, 896 F.2d 642, 645 (1st Cir. 1990)("a defendant undermines the integrity of the criminal justice system when he commits a crime while ...

15

under its supervision and control"); United States v. Wallace, 573 F.3d 82, 96 (1st Cir. 2009) (commission of crime at a time when "one would expect a careful abidance to the law ... demonstrated [defendant's] propensity for criminal behavior")(internal quotations omitted).[10]

## PROPOSED SUPERVISED RELEASE CONDITIONS

---

[10] A final aggravator in this case is the defendant's involvement with the H-Bloc Gang.  In detention testimony from Galloway's 2010 case, BPD Detective James Sheehan identified H-Bloc as one of the primary gangs involved in violence and shootings and stated his believe that Galloway was an H-Bloc member based on certain gang tattoos and incidents in which he was in the company of other H-Bloc members.  See testimony of BPD detective James Sheehan (August 13, 2010) at 35 (attached as Exhibit 5).

Gang membership is an important marker for recidivism and statistically puts him in the midst of Boston's gun violence. See Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"). Accord, Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending"); United States v. Johnson,184 Fed. Appx 746, 748 (10th Cir. 2006)(at sentencing, gang membership was "significant and appropriate for inclusion in the PSR because. . . . gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens").

The critical question here is whether the defendant has maintained his H-Bloc connection since he was last in Federal Court.  That is a difficult issue given the permanence of his tattoos, the amount of time he has spent in jail, and his apparent compliance with the Associational and Geographic Restrictions while on Supervised Release, the government can say that with respect to the 6 BPD FIO's conducted of the defendant between the time that he got off getting off federal supervised release in January, 2016, and his arrest here 9 months later, 4 took place inside the exclusion zone included in the 2011 Judgment of Conviction and 4 took place while the defendant was in the company of other identified members of H-Bloc.  There is no evidence that any of the individuals involved in the defendant's arrest in this case had any H-Bloc connection.

The government is seeking the following special conditions of Supervised Release to assist the defendant when he has completed whatever sentence the Court imposes:

**(1) Associational and Geographic Restrictions.** Based on positive experience while on his last period of Supervised Release, the government believes that the same Associational and Geographic Restrictions should be imposed with only the name of the Unique long, the driver of the Honda at the time of his arrest added. To the Associational Restriction.   They are attached as Exhibit 6.

**(2) Curfew.** When the defendant is released from BOP custody (either prison or an RRC), he should be placed on a curfew that will encourage him to be home at night rather than in places where he might renew longstanding criminal associations. The defendant should therefore be subject to a 9 p.m.-7 a.m. curfew for the first 6 months following his release. The Probation Office should have the power to relax the curfew (which should be enforced by electronic monitoring) for school or employment.

**(3) Substance Abuse/Mental Health Issues**. The defendant should be tested for drug use and should be required to participate in either mental health or substance abuse counseling if directed to do so by Probation. Given the issues discussed in paragraphs 71-73 of the PSR, the government

believes that the Court should also make a judicial recommendation that the defendant be given any available mental health treatment while incarcerated.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY

By:  /s/John A. Wortmann, Jr.
     JOHN A. WORTMANN, JR.
     Assistant U.S. Attorney
     One Courthouse Way
     Boston, MA
     (617) 748-3207

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ John A. Wortmann, Jr.   7/21/17
JOHN A. WORTMANN, JR.